I thought that was going to be a swift argument. May it please the court, my name is Mike Mazza. I represent Plaintiffs Appellant ABT Systems. We've raised two issues on appeal, Your Honors, marking and damages, and unless the court suggests otherwise, I was going to start with marking. I think it's appropriate to look at the standard. The Eighth Circuit, this trial came out of St. Louis, the Eighth Circuit standard says that judgment as a matter of law should not be granted unless the evidence points all one way or unswervingly one way. We would respectfully suggest that that was not the case here. There were nine licenses that ABT entered into that required marking. There was one that did not require marking. One which was 40% of the sales, at least, right? The cross appellant has suggested that it could have been, Your Honor, but there's no actual evidence in the record that any of those sales were made after the license agreement was settled. In fact, if Your Honor would… I'm sorry, I didn't understand your statement. None of those sales were made after the license agreement was settled? Yes, I'm sorry, I misspoke. There was a lawsuit in 2002 for sales from 2000 to 2002, and in March of 2003, that lawsuit was settled by a settlement agreement. And any sales after that license agreement, dated March 2003, were projected sales only. There's no evidence in the record of any actual sales, and Emerson admits that the March 2003… What was your evidence of marking that you said was sufficient? Okay. So nine license agreements, so it's a rule of reasons, substantial compliance standard. There were nine license agreements that required marking. We delineated that in the blue. But the license agreements alone are not enough under our law. Isn't that correct? Well, there was… Let's assume just for purposes of argument that you had a case and you said my evidence of marking are nine licenses that require marking, period. I have nothing else. All right. You wouldn't be able to withstand a summary judgment, could you? I don't know, Your Honor. When third parties are involved, I know it's not… I mean, you're assuming that the existence of the license is circumstantial evidence that the licensee behaved? Correct. Why is that an inference that is reasonable? Well, I don't think it's unreasonable because it would be a breach of the contract and subject to a lawsuit if they didn't comply. But we're certainly not taking a position that it was the license agreements alone that was an evidence. I mean, that was, I think, weighty evidence here that all nine out of the ten were required. Beyond… I'm sorry, I interrupted your answer to the Chief. No, not at all. So beyond that… What is there beyond the nine licenses? Right. So beyond that, we had unrebutted testimony from the inventor, Armand Rudd. He was a very visible industry consultant. He went to numerous annual trade shows. He policed the internet. Did he testify that when he went to the trade shows, he walked up and down and looked at the boots and inspected the product of the licensees to ascertain whether they were marked? He did testify that when he was at the shows, he was looking for marking. And that's at A5193 to A5195. He did testify that he obtained and he observed marking on his samples of licensed products at those shows. These were annual trade shows, so is there testimony as to how many of these he went to and how many products he observed? He did testify that at least once annually, but typically more than that at these shows. And we do have… So he was at one show? I remember him testifying at least annually, but I don't remember that typically. You just said typically more than annually. I may stand corrected. One second. My memory is a little bit vague on this, so I'm not trying to suggest that you are incorrect. I asked him, how about trade shows? Do you go to trade shows? Answer, yes, I do. How often? Typically once a year, at least once a year. Is that something you look for or not? Yes. For the ones that are at the trade shows, I would look, for instance… That would be at least once a year, not necessarily more than once a year. At least once a year is fair. I stand corrected. And we also have, I've given to the clerk, we did give samples of physical marked licensed products that were brought to the trial. And we also have evidence that Mr. Rudd came forward and he said, this was not at Emerson's property. This was Mr. Rudd on his own saying, I had one unexcused problem with Venmar. I had a dispute with RPC and they pulled product off the shelf, marked it, put it back on the product. So there was evidence that Mr. Rudd was monitoring this. And it wasn't just a situation where he just relied on the license agreement. I think it's important to recognize too that Emerson presented no contrary evidence. And I think it's also useful to realize that Honeywell, this multi-billion dollar company, had a bargaining position with Emerson, with ABT. Little ABT, sole proprietorship, didn't have… It was difficult for ABT to insist that Honeywell mark in the first license agreement. So again, it's a reasonable rule of compliance. The issues that you're arguing now are going to be mooted if we agree with the cross-appellant on the validity issue, right? Yes, Your Honor. I take that as… I notice you've reserved five minutes of your time. I did, Your Honor. That's all the time you'll have to address the validity issue, right? Am I done with my ten? I'm looking. No, you've got eight minutes. Okay. You've got… The clock started at 15. Oh, thank you. Appreciate it. Okay, so just very quickly on the hearsay rule, and then I'll get to validity. The court… The one point I wanted to make here is that the court at A-5-6-6-4 to 5-6-6-5, clearly made a hearsay exclusionary rule under 8-0-3-6 based on the timing issue. In other words, the court said, it appeared to me that the court said solely because the licensee records were created after the lawsuit started, that alone kicked them out of the hearsay exclusionary rule. And we would suggest that that is not the law. And because the evidence demonstrated that Mr. Rudd relied on the marking in his ordinary course of business, that would be sufficient. Well, what's the standard of review with respect to this hearsay? Well, we believe it's a de novo standard, Your Honor, because this is a legal issue under 8-0-3-6. Now, if it was a pure fact… Is this an evidentiary ruling? If it was a pure evidentiary ruling, it would be an abuse of discretion. But we believe the court made a legal error on saying that 8-0-3-6 doesn't apply because of the timing issue. We think, as a matter of law, that was incorrect. I'm going to switch to validity, if that's okay. So, the standard for validity, legally sufficient evidentiary basis. We start with this idea that there was a thermostat paradigm, namely that there was unrebutted testimony, for example, 8-5-0-9-8, that prior thermostats had an on-off switch, a system switch to turn the heating and cooling on and off, and they had a separate fan switch on or off. Mr. Miles, the sole issue really on validity is whether references can be combined, correct? I think that's fair. And so, with that factual predicate in mind, what was lacking in the prior art was this idea of coordination or linking of the system switch with the fan switch. So, there wasn't a teaching of control logic, and that was the paradigm shift that Mr. Rudd had talked about and some of the witnesses had talked about. We called that trial a smart feature, but the idea was there had to be some electronic linking of logic control between the system switch and the fan off-on switch, and current thermostats didn't have that. Is that control logic a claim limitation? Not explicitly, but it is in the sense that the fan recycle control feature inherently requires that. Can't your claim be infringed without logic control? I don't think so, Your Honor. Why not? Because the fan recycle feature inherently must work in tandem with the system switch. Because the fan recycle feature says, when the cooling system goes on or off, pause, and then turn the fan on. So, there has to be some coordination between the system and the fan switch. I'm new into your rebuttals, so why don't we hear from the other side. Thank you. Good morning. May it please the court. The district... Because of finding that the 017 patent is obvious, is dispositive of the entire case, I will deal with that issue first, and then I will follow it with the damages and marking issues that have been raised by the court. The patent in this case is exactly what the Supreme Court and KSR said is obvious, and that is an arrangement of old elements with each performing the same function that has been known to perform that yields no more than one would expect from such an arrangement. I have some charts here that were used during the trial to talk about how they work. It's a very simple product. This is Mr. Rudd's 017 patent. When the heat or cooling, both are considered air conditioning, is on, for all thermostats, the fan has to be on simply to avoid this problem. You said this was used, was this an exhibit at trial? It was not an exhibit. It was a demonstrative, and that's really all I'm using here is just a quick explanation of how this works. Okay. Does your adversary object to this? No, Your Honor. It wasn't evidence at trial, but it was allowed at the demonstration. Just that the fan then cycles on when there is no call for heating or cooling. So that's the empty spaces. And in Mr. Rudd's patent, that's a preselected time period for the delay before the fan starts. So that's what that is. With regard to obviousness, Mr. Rudd, the inventor, testified that it was well-known before his invention that the fan of a forced air HVAC system moved and circulated the air. That's what a fan does. He also testified that it was well-known before his invention that when the fan ran, it mixed and circulated the air. And then when the fan stopped running, there was no need immediately to run the fan again because the air had just been circulated. Didn't Dr. Siegel testify that there wouldn't have been a motivation to combine? Dr. Siegel's testimony on motivation to combine was a little bit curious. He did testify that there would be no reason to combine them. I thought he said 6196 to 6199. In the record where I had my slide, it's probably that. 6196. Yes, I have that, Your Honor. Dr. Sherman testified that a rosagang with Petronil would render his patent obvious to agree. I do not. Why is that? Several reasons. He goes on to testify why he believes they should not be combined. That's right. He said the big ones are the direction that you would be led by, for example, the Petronil. So the question I want to ask you is, the jury seems to have believed that. Because all hands, including your adversary, seem to think that the prior art contains the elements of Mr. Rudd's claim. So the case turns on combination. That's right. Well, if expert so-and-so, now Dr. Siegel wasn't, he wasn't impugned as an expert, right? He wasn't an expert. He was an expert. So he, jury sits there and says, this guy knows what he's talking about. And he says, I wouldn't combine. You get a jury verdict that comes back and says claims are not obvious. Has to be that they believe Dr. Siegel. Right? Yes. So what's your case? Sure. You believe in the jury system, right? Absolutely. Right? So your argument is that this district court judge lost his or her marbles when they sent this case to the jury. Because the trial judge should have disbelieved Dr. Siegel, right? That's your argument. When you're arguing, J-Mal means that it was wrong to send the case to the jury. That's correct. Because your J-Mal before the case went to the jury is the same as your J-Mal after. So why was this judge taking leave of his or her senses when they sent the case to the jury? Well, I don't think the judge was taking leave. Well, I'm colloquially always saying it, if you don't mind. But the short of the matter is that you have jury heard Dr. Siegel. That's right. And in most cases, you have experts on both sides of the case. But Dr. Siegel used the wrong test for enablement. Enablement? Enablement. That's part of the reason that he said this wasn't obvious, was that none of the prior art was enabled. That doesn't have to do with combining. Exactly. I think everybody agrees that reference doesn't have to be enabled in order to be pertinent in a 103 analysis, right? That's correct. I'm still talking about combination. Now, he gave his reasons for combining, right? Didn't I point you to the record? Yes, you did. It doesn't seem like it's your burden to explain to us why the judge should have leaned over and said, Dr. Siegel, those reasons aren't any good. Don't you have to convince me that those reasons aren't any good? Yes, I do. Have at it. Okay. Looking at Dr. Siegel's testimony here, he said that the direction you would be led by Patron focuses on cooling performance. And that's right. The Patron patent dealt with an air conditioning cooling system. It had a pre-selected part. You wouldn't be motivated to combine that with Vogelsang because Vogelsang dealt with healing and cooling. But there was no explanation as to why a thermostat that causes the fan to cycle periodically when there's no call for heating or cooling, such as Cornelius and Vogelsang. I didn't see any evidence in the record that you cross-examined Dr. Siegel in the manner that you're doing right now. Was Dr. Siegel cross-examined? He was cross-examined, and I focused in the cross-examination on enablement and teaching away, which were two areas that he focused on. But not on his rationale for combination. I'm sorry to be fussy about this, but it just seemed to me when your adversary, I think, admirably in response to Judge Schall, said, yeah, this is a combination case. So that's why I'm pushing it. Right. I think that Dr. Siegel, to a certain extent, was saying that he wouldn't combine them because Cornelius and Vogelsang and Nakatsuno, they were not enabled. They wouldn't work, and there's no motivation to combine something that doesn't work. That was one of the ways he was going. And so I focused in the cross on the enablement argument, which, of course, is that it is still useful for what it discloses. Let me ask you sort of a more refined version of what I've been talking about. I assume you're right that I wouldn't fault you for your cross-examination of Dr. Siegel, but here we're sitting on a case trying to decide whether the jury was entitled to leave Dr. Siegel. And even though Dr. Siegel may have thought the references couldn't be combined because they shouldn't have been considered in the first place because they hadn't been enabled, what do we do with this case where we know that the references were properly considered? Are you saying this is a case in which there's no rationale? Dr. Siegel didn't really have a rationale to combine beyond his enablement theory? Well, his enablement theory and his argument that it taught a way, but he used the wrong test. He argued that something would teach a way if it didn't lead you towards the combination. So the fact that the Cornelius and Vogelsang patents didn't say you have to have a pause here meant that they were teaching away from the problem. I'm trying to define in my own mind, assuming just for purposes of argument I wanted to rule in your favor, I have to get rid of Dr. Siegel. That's correct. I've got to get rid of him, totally get rid of him. So I've got to get rid of him on teaching away. I've got to get rid of him on enabling. I've got to undercut his theory of why you would combine the references, right? Right. Is there anything else that you have in your armor for undercutting Dr. Siegel beyond your view that he's wrong on the teaching away and the enablement? He's wrong on both of those. He said that one of the big reasons you wouldn't combine them was that they had a different objective than the Rudd patent. Are you talking about inoperability? No, simply that they had a different objective in that Patron was talking about you would pause the fan to allow the coils to cool and the water that would condense on them to drip off before you blew it back into the house. That was the objective of the Patron patent. That part of the teaching away argument? Sort of, yeah. And the Rudd patent and the Vogelsang patent were talking about circulating air in the house only as often as it needed to be circulated. Both Dr. Siegel and Mr. Rudd, the inventor, testified that there's no need to run the fan again if it's just been run because the air has been well mixed. There's no hot spots, cold spots, stuffy air. During the call for heating and cooling, the fan is always on. So right afterwards, they both admitted that there is no need to run the fan then, which is exactly what… Doesn't everybody agree, and I'll make a little pun in honor of Judge Lurie who likes to make them, that this patent's a pretty cool idea. I mean, it hadn't been practiced in the art. Virtually everybody in the industry is using it, right? So it's… Aren't there secondary considerations here? The secondary considerations… Actually, Your Honor, you raise a good point about everyone's using it. There was evidence that a number of companies had taken licenses. A couple of them stopped making it after they took a license. Emerson took it out of its product. And so did they put it in? Yes, in a very small percentage of their thermostats. This was dealing with just these big blue thermostats for Emerson. And it's like many other markets. If your competitor puts something in, you put it in, which is exactly what the evidence showed here. Honeywell had a product out that caused the fan to run that way. And it also had a great big touchscreen on it. And Emerson really liked the touchscreen and decided we need one of those. Checked the patents on that and the circulating fan. Came up with the Vogelzang patent, which the fees had not been paid on, so that was free to use. And Emerson believed they were using the Vogelzang patent, one of the prior art patents. And they went ahead with the fan. So that's how this happened. You're into your rebuttal, so why don't we save your rebuttal and move to the other side. Thank you again. Just two real quick points on validity. I think it is hard to knock down Mr. Siegel. But I think also relying on Dr. Sherman's testimony from Emerson's technical expert is instructive. Dr. Sherman at A5943 line 20 through A5944 line 15 testified that the basic control strategy of thermostats using fans was to run the fan only during heating and cooling, the so-called auto feature. And then he went on to list about ten variables that could affect fan operation. And he ultimately admitted that there's just, quote, too many variables making it, quote, too difficult to know a clear answer when to run the fan. That was at A5944 line 16, A5947 line 19. So I think the jury could have credited that testimony. And how does that cut? That's your adversaries expert, right? Correct. He's not saying combine the references. He's basically saying there's just too many variables when it comes to fan operation to know when the fan ought to be run. And so that's suggestive to a person wondering. Because there wasn't a clear guidance as to what to do. You know, I asked him, what if you held cost, humidity, control, and energy efficiency? I'll give them equal weight. He said it'd still be too difficult to know when to operate the fan. There just wasn't clear guidance in the prior article. I guess that's the point I'm making. On the legal points, do you agree that enablement is a question with regard to anticipation and not obviousness? Generally, that is the law. Did your expert rely on the lack of enablement to support his view that there was no motivation to combine? I don't know if he clearly parsed that as a legal matter. I think it's fair to say that he gave specific reasons for each prior art reference why it was not obvious. For example. And among those reasons, did that include the fact that the prior art was not enabled? As to two of the references, Cornelius and Nakasuno, he did find them non-enabling as to the control logic. And I think his point was, if I could sum it up, his point was, yes, it's not enabling. But also, there's no filling the gap here. There's no prior art reference that says, oh, here's what you should be doing from a control logic standpoint. As we point out in our brief, Dr. Sherman admitted that Vogelsang doesn't do that. In fact, if you look at the drawing of Vogelsang and you trace the wires, the wires from the system operation and the fan operation don't even interconnect. Just a quick note on damages. The only point I wanted to make here is it's uncontradicted on this record, given the evidence, that our damages expert could not understand their January 2013 spreadsheets. And that's A3385, 86, paragraph 3. When we told the court during the trial, it was, quote, we struggled with understanding the sales numbers. It was, quote, incredibly hard to understand them at A5630. And we suggested a reasonable solution. We said, your damages expert doesn't have these numbers in his report. Ours doesn't either. We can't understand them. Why don't we just give the jury a royalty rate, and then we can determine these numbers that we can't figure out later after the trial? We thought that was a reasonable solution, but it was rejected. One last thing. The district court, in her ruling where she rejected our damages supposition, our Rule 60 motion, she said at 819, I find that none of your cases teach or hold awarding damages for infringing sales before the jury verdict. And, in fact, there were two that we cited to her, Maxwell and Boston Scientific. And both of those cases, and in particular, Boston Scientific is this one, pre-trial infringing sales were, after the verdict, under Rule 60, a motion amended to judgment was granted in those cases. Thank you very much. Thank you. Just as a cautionary note, typically the panel has allowed you a lot of leeway because with regard to your main appeal, we usually typically do not allow you to raise issues that hadn't been raised previously where the other side has not responded at all. That is why we rely on the briefs to a great extent in any event. Just a couple of things that I want to clear up. First of all, there was talk about Dr. Siegel and what he had said. He also testified that generally, if the fan's been running, you assume some mixing, and so don't run the fan for a while because the air has just been mixed, which is exactly the combination that he had said earlier was taught away from. It's simply a combination of the prior art patent, particularly for a newly enrolled client that have a fan that cycles when there's no proper heat or cooling, and a pause. What about your friend's comment about your own expert's testimony? Yes, absolutely, because that question at that time was very specific as to what's the best time to run the fan. But the Rudd patent doesn't answer that either. The Rudd patent simply says there's a pause before it starts cycling, and you can set that to anything. It could be a one-minute pause. It could be, like Emerson's, a one-hour pause. So Dr. Sherman was correct. There's no way to know in any specific house what that pause should be, but the fact that there should be a pause was agreed by Dr. Siegel when he said if the fan's been running, as it does during the call for heating or cooling, you assume some mixing, and so don't run the fan for a while because the air has just been mixed. That's the combination. What do we make of the reaffirming, if you will, of the patent on reexamination in the face of at least some of this prior art? Hanson, I'm sorry, not Hanson Kitsch. Vogelsang. Vogelsang and Nakatsuno. Yes. I think that the patent office was confused looking at the record on that over the word dependent and independent of. Vogelsang talked about how the fan cycles independent of the heating and cooling, so it's independent. The Rudd patent says that the cycling of the fan depends on a preselected pause. They're really saying the same thing, but they're using opposite words, and I think that the patent examiner got that confused. That was also before KSR where there wasn't. Isn't your easy answer that the reexam was before KSR? Well, that would be the easy answer, yes. Well, I mean, they're using a different test for motivation to combine. That's right. That's right. There's one more point I want to make on damages. No, no, no. You're on your cross appeal, so we don't, even though I cautioned your friend. Okay. I just wanted to respond to what he just said. No, I appreciate that, but I think we're out of time. All right. Thank you.